IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CATHLEEN SCHANDELMEIER-BARTELS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | No. 07 CV 922 |
| v. | ) |  |
| CHICAGO PARK DISTRICT, and ANDREA C. ADAMS | ) | JUDGE DAVID H. COAR |
|  | ) |  |
| Defendants. | ) |  |

## MEMORANDUM OPINION AND ORDER

Cathleen Schandelmeier-Bartels ("Plaintiff") is suing her former employer, the Chicago Park District ("Park District"), and Andrea Adams ("Adams") (collectively referenced as "Defendants"), for reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981 ("Section 1981"), and 42 U.S.C. § 1983 ("Section 1983"). Plaintiff also asserts three retaliation causes of action, under Title VII, Section 1981, and the First Amendment, and a cause of action for the Illinois common law tort of retaliatory discharge. Before this court now is Defendant's Motion for Summary Judgment for each remaining count of Plaintiffs' Second Amended Complaint. For the reasons set forth below, Defendant's motion is **DENIED** in part and **GRANTED** in part.

### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). This standard of review is applied to employment discrimination cases with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

## II. FACTUAL BACKGROUND

The facts as presented by the parties lay before this Court in a tangled web. As the Seventh Circuit has noted before, summary judgment briefs that present multiple versions of the facts arouse special attention at the outset. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 753 - 754 (7th Cir. 2006) (citations omitted). Because the Court's task upon review of a summary judgment motion is to determine whether there is any material dispute of fact that requires a trial, multiple versions of the facts increase the chances that at least one of those conflicting facts will be material to the outcome of the case. *Pourghoraishi*, 449 F.3d at 754. The Court reviews the relevant facts stated in the light most favorable to Plaintiff, and will note where appropriate conflicting facts presented by Defendants.

2

Defendant Park District is a public agency organized and existing under the laws of the State of Illinois for the purpose of controlling and supervising the operations of all parks, boulevards, and public ways under its jurisdiction. Plaintiff is a Caucasian woman. She was hired as the Cultural Program Director for the South Shore Cultural Center ("the Center") in February of 2006. Her employment ended on August 1, 2006. As Program Director, Plaintiff was responsible for running the Center's afterschool and summer camp programs. Rule 56.1 Statement of Facts ("SOF") ¶ 2. Plaintiff reported directly to Defendant Andrea Adams, who reported directly to Alonzo Williams, who in turn reported to Megan McDonald. Adams and Williams are African-American, and McDonald is White. SOF ¶ 3-4.

Two incidents during Plaintiff's employment warrant special attention. First, Defendants assert that Plaintiff wrote an offensive play shortly after she was hired. The play was entitled "Vaudeville." It featured offensive stereotypes of African-Americans as "pickaninnies" and "sambo[s]," and was to be performed by the mostly African-American children of the afterschool program. SOF ¶ 6-7. According to Defendants, the play is evidence of Plaintiff's racial insensitivity. Plaintiff contends to the contrary that she wrote the play only at the instigation of her African-American colleague, who had taken an ethnic studies course and wanted to make the children aware of the racist stereotypes historically deployed against African-Americans. SOF ¶ 6. Neither party contends that the "Vaudeville" incident was directly related to Plaintiff's termination.

Second, Plaintiff witnessed what she believed to be an incident of child abuse on July 31, 2006. SOF ¶ 27. She claims to have heard the cries of a summer camper ("J.J.") and to have seen that camper's aunt raising a belt as if to strike the child. SOF ¶ 68. Both J.J. and his aunt are African-American. All District employees are mandatory reporters of suspected child abuse.

3

SOF ¶ 28. After witnessing the incident, Plaintiff relayed what she had seen to Hollee Mangrum-Willis, an African-American Park District employee. Mangrum-Willis allegedly responded by saying, "It's a Black thing, Cathleen. We beat our children." SOF ¶ 71. Defendants deny that Mangrum-Willis made those statements. Later that day, Plaintiff told Defendant Adams what she had seen. According to Plaintiff, Defendant Adams said she would leave the response up to Plaintiff, and added:

> I have to let you know that in our culture this is the way we discipline our children. Before Hillary Clinton wrote, "It takes a village," that was the philosophy that our culture followed and I have permission to grab any child here I have unspoken permission. You see these junior counselors? Well they have grown up with me, and I know their parents. And if they step out of line, I have permission to grab anyone of them and put them back in line.

SOF ¶ 75. Plaintiff understood "grab" to mean "physically intervene," and "our culture" to mean African-American culture. *Id.* Defendants deny that Adams made the statements above.

Later that evening, Adams called her supervisor Alonzo Williams and Human Resources Director Mary Ann Rowland, and relayed to them what Plaintiff had told her. SOF ¶ 76-77. Adams told Rowland that Plaintiff was aware that she had the right to call the Department of Child and Family Services ("DCFS"). *Id.* At her deposition, Rowland did not recall the July 31 conversation she had with Adams, and instead recalled that her first conversation with anyone regarding the incident with J.J. occurred on August 2, 2006. Rowland Dep. 61:9-18, Feb. 15, 2008.

Plaintiff called DCFS late that evening, and was advised to call the Chicago Police Department. SOF ¶ 79. Plaintiff called the police the following morning, August 1, 2006, around 9:30 a.m. SOF ¶ 81. At around 11:15 a.m., Plaintiff was called into Defendant Adams' office to discuss the events surrounding the alleged child abuse and Plaintiff's report to DCFS and the police. Plaintiff alleges that Adams spoke angrily to Plaintiff, in substance attacking her

4

(1) for reporting an incident of child abuse that may not have actually occurred (because Plaintiff did not witness the moment of impact and Adams believed the belt J.J.'s aunt raised could have simply been a threat rather than an actual strike), (2) for creating a police record for J.J.'s aunt based on an alleged incident of child abuse that may not have occurred, and (3) for her cultural insensitivity. SOF ¶ 82. With regard to the last, Adams allegedly said, "This is the way we discipline our children in this culture." When Plaintiff said, "My friends who are Black don't beat their children," Adams responded, "Your friends who are Black tell you that they don't beat their children and then they go home and they beat their children." *Id.* Adams was "really angry" when she said, "Now [J.J.'s aunt] is going to have a police record and it all is going to be [Plaintiff's] fault . . . . You sent the police to this woman's house." Adams was allegedly "ballistic," yelling at the top of her lungs, "Get out of my office . . . . I can't stand the sight of you." *Id.* Defendants dispute the time of the meeting and deny that Adams made the quoted remarks.

After meeting with Plaintiff, at some time between 10 a.m. and 1 p.m., Defendant Adams wrote and sent a memorandum to McDonald and Williams. The memorandum documented several prior instances where Plaintiff had failed in her duties by failing to control the summer camp, failing to report disciplinary or medical incidents, leaving children behind during field trips, and engaging in favoritism (Plaintiff's son attended the summer camp). The memorandum concluded that the incident with J.J. was "the last straw," because Plaintiff had failed to discuss half of J.J.'s discipline reports with J.J.'s guardian, and had failed to ascertain whether child abuse had actually occurred before she called the police. Defendant Adams wrote, "It is difficult working with someone that does not follow instructions and continuously follows their own

directive . . . . Something has to give." Memorandum from Andrea Adams to Megan McDonald and Alonzo Williams (August 1, 2006).

Plaintiff was presented with a letter terminating her employment at or around 6 p.m. on August 1, 2006. SOF ¶ 93. The parties dispute the date that the decision to fire Plaintiff was actually made. It is undisputed that McDonald consulted with Rowland via email on July 24, 2006, to determine whether McDonald needed to schedule a Corrective Action Meeting ("CAM") in order to terminate Plaintiff. SOF ¶ 25. Because Plaintiff was a non-union probationary employee, no CAM was required. *Id.* Defendants claim that McDonald instructed Rowland to fire Plaintiff on July 24, 2006. SOF ¶ 26; Def.'s Mot. Summ. J. 8 ("McDonald made the decision to begin the process to terminate Plaintiff on July 24, 2006 . . . ."). However, it is unclear whether the email was a directive to terminate Plaintiff or merely an inquiry into the termination process. The email ends, "If we need to schedule a CAM, please do that as soon as possible. If we don't – can you please check with Beka and confirm that we are able to release her?" Rowland asserts that she signed the letter terminating Plaintiff between 8 and 9 a.m. on August 1, 2006. Rowland Dep. 6;16-24, 115:22-24, Feb. 15, 2008. Plaintiff cites the "last straw" language of Adams' August 1 memorandum as evidence that the decision to fire Plaintiff was not made until after the memorandum was received by McDonald and Williams, which would have been after 1 p.m. on August 1, 2006. Pl.'s Mot. Summ. J. Response 14.

### III. ANALYSIS

#### A. Race Discrimination

Plaintiff, a Caucasian woman, argues Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and 42 U.S.C. § 1983 because she was allegedly dismissed due to her race. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge

6

any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 similarly guarantees persons of different races equal rights in the making and performance of contracts, including employment contracts. Section 1983 extends the reach of the federal antidiscrimination prohibitions to persons acting under the color of law.

### 1. Indirect Method of Proving Discrimination Under Title VII[1]

To survive a summary judgment motion, an employee alleging employment discrimination must show incidents of illegal discrimination through either direct proof or, more commonly, indirect proof.[2] *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003). The indirect method of proof is a burden-shifting approach, where the plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, (7th Cir. 2002); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000); *Szymanski v. County of Cook*, 2002 WL 171977 at *5 (N.D.Ill.). Once the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment

---

[1] A *prima facie* case of race discrimination under Sections 1981 and 1983 are predicated on the same elements as a discrimination claim under Title VII, so the Court analyzes these aspects of the case together. *Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001).

[2] The Court notes that these two methods of proving discrimination under Title VII are appropriate for summary judgment, but are not followed at trial. *Beniushis v. Barnhart*, 48 Fed. Appx. 203, 206 (7th Cir. 2002) ("It is not generally appropriate to introduce that framework at trial. By that time, the prima facie question has been resolved and the focus is on the ultimate question of whether or not discrimination occurred.") (citing *United States Postal Serv. Bd. v. Aikens,* 460 U.S. 711, 714 (1983)). At trial, the Court will most likely instruct the jury according to the Federal Civil Jury Instructions of the Seventh Circuit 3.01 (West 2005), which essentially gives a but-for instruction; it asks juries to consider, if everything else had been the same, whether the plaintiff would not have been fired if she had been of a different race. This follows the approach first set out by the Seventh Circuit in *Gehring v. Case Corp.*, 43 F.3d 340, 343-44 (7th Cir.1994). There is also a pattern instruction for mixed motive employment decisions, which may be more appropriate for this case.

7

action. *Szymanski*, 2002 WL 171977 at *5. If the employer satisfies that burden, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff to persuade the trier of fact either directly that a discriminatory reason more likely motivated the action or indirectly that the employer's articulated reason for the employment action is unworthy of credence and is but a mere pretext for intentional discrimination. *Id.*

In order to establish the *prima facie* case of employment discrimination under the *McDonnell Douglas* schema, a plaintiff must provide evidence that "(1) he is a member of a protected class under Title VII, (2) his work performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees outside of the protected class were treated more favorably by the employer. *Goodwin v. Bd. of Trust. of Univ. of Illinois*, 442 F.3d 611, 617 (7th Cir. 2006). If a plaintiff proceeding under the indirect method fails to establish any one of the four factors of the *prima facie* case, the court generally need not proceed any further and summary judgment will be entered for the defendant. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680-681 (7th Cir. 2002).

The Seventh Circuit has stated that in so-called "reverse discrimination" cases, Caucasian plaintiffs must show other "background circumstances" in lieu of their inability to satisfy the first element. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). The *Mills* court identified several kinds of background circumstances a plaintiff could use to establish a *prima facie* case in a reverse discrimination case. That Court also cited *Harding v. Gray*, where the court articulated two categories of evidence that satisfy the background circumstances test: (1) evidence indicating that the particular employer has some reason or inclination to discriminate invidiously; or (2) evidence indicating that there is something "fishy" about the facts of the case.

9 F.3d 150, 152-53 (D.C.Cir. 1993) (cited in *Mills*, 171 F.3d at 455). Something can be "fishy" if a plaintiff presents evidence that the employer's actions "departed from the usual procedures in an 'unprecedented fashion.'" 171 F.3d at 455.

Here, Defendants contend that Plaintiff cannot meet her burden under the *McDonnell Douglas* burden-shifting scheme. First, Defendants contend that Plaintiff failed to meet the Park District's legitimate employment expectations. Second, Defendants contend that Plaintiff cannot that show similarly situated employees were treated more favorably than her because she is without a comparator; she was the only person in her position at the Center. Third, Defendants argue that Plaintiff cannot demonstrate any background circumstances that indicate Defendants were inclined to discriminate against white persons in favor of people of color, in part because Plaintiff was hired and fired by the same white woman (McDonald) and Plaintiff's position was later replaced by a white woman.

The Court agrees that Plaintiff has failed to meet her burden under *McDonnell Douglas*. Plaintiff's response failed to identify a single employee in the Park District that could be considered a similarly situated comparator. Plaintiff makes only a perfunctory argument for the "background circumstances" requirement, arguing that the required "fishiness" was evidenced by the fact that Plaintiff was one of only three Caucasian employees at the Center (which employed twenty people) and that virtually all of the summer campers and afterschoolers were African-American. Defendant replies that all of the Center's employees, with the exception of Defendant Adams, were Plaintiff's subordinates. Indeed, the mere fact that Plaintiff's race was in the minority at her place of employment does not make the facts "fishy." Therefore, Plaintiff has not proven a *prima facie* case of employment discrimination under *McDonnell Douglas*.

### 2. Direct Method of Proving Discrimination Under Title VII

However, a plaintiff alleging employment discrimination need not proceed under *McDonnell Douglas* in order to survive summary judgment. She can instead proceed under the direct method of proof.

Employment discrimination under the direct method can be demonstrated either with direct evidence or circumstantial evidence. While the typical direct method situation is an admission of discriminatory animus by the employer, the Seventh Circuit has stated that a plaintiff "can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). The Seventh Circuit has recognized three means by which a plaintiff can defeat summary judgment using circumstantial evidence under the direct method. *Id.* at 781. The first is through the demonstration of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. The second is through evidence that a similarly situated employee received more favorable treatment, and the third is through "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Id.* (citations omitted); *Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 720-21 (7th Cir. 2005). Plaintiff argues the second: that the facts adduced in this case are circumstantial evidence constituting the "bits and pieces from which an inference of discriminatory intent might be drawn."

The Court agrees. At summary judgment, the movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. A genuine issue of

material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. Defendants have not met their burden. Here, the direct method evidence presented in this case precludes a grant of summary judgment: there are disputes regarding whether (1) Defendant Adams made comments to Plaintiff about the alleged African-American practice of corporal child discipline, (2) whether the decision to terminate Plaintiff was made before or after Defendant Adams sent her August 1, 2006 memorandum to McDonald and Williams, and (3) on what basis McDonald, Rowland, Williams, and/or Adams decided that Plaintiff deserved to be terminated. The strongest evidence permitting an inference of discrimination on the part of the decisionmaker are the remarks that Defendant Adams allegedly made on the morning of August 1, 2008, to Plaintiff. If a jury believes Plaintiff's testimony that Adams angrily berated her for calling DFCS and the police regarding J.J. and stated that African-Americans discipline their children differently, it could also conclude that had Adams would not have reacted as she did had Plaintiff been African-American instead of Caucasian. A jury could believe that Adams objected to Plaintiff in her employment capacity because of her race and perceived inability to understand allegedly African-American social mores, leading her to write the August 1 memorandum that may have caused Plaintiff to be fired later that same day.[3]

---

[3] The parties also dispute *who* made the decision to fire Plaintiff. Direct evidence must demonstrate discrimination on the part of the *decisionmaker*; evidence of an employee's prejudices is irrelevant if it is not related to the adverse employment decision complained of. *Phelan*, 463 F.3d at 779. For this reason, the statements by Mangrum-Willis and others without decisionmaking authority are irrelevant, as is the "Vaudeville" episode, which neither party contends was related in any way to Defendants' decision to fire Plaintiff. Defendant Adams' statements, however, are relevant because she arguably acted as a decisionmaker in the decision to fire Plaintiff. Defendants assert that McDonald made the decision unilaterally, Def.'s Resp. to SOF ¶ 88, but McDonald admits in her deposition that "I as the Director of Lakefront Operations made the final decision, but it was a discussion with the group [including Adams] that led us to that decision." McDonald Dep. 19:2-7, 7:6-10 March 10, 2008. Furthermore, even if Adams did

11

Taken together with the suspicious and unexplained timing of Plaintiff's actual termination—which Defendants excuse as mere coincidence—and the ambiguity surrounding the date that the decision to fire Plaintiff was made, a reasonable jury could conclude from these facts that Plaintiff had been fired at least in part because of her race. Summary judgment as to Count I is therefore denied.

### 3. Municipal Liability under § 1981 and § 1983

Defendants argue that, with respect to the Park District, summary judgment should be granted as to Counts II and III because there is no evidence that the Park District had a custom, policy or practice that promoted race discrimination, nor evidence of widespread discrimination against Caucasians or that a final policymaker fired Plaintiff, any of which could have been sufficient evidence to support an allegation of municipal liability under § 1981 or § 1983. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Plaintiff failed to present any evidence on any of the three possibilities listed above. In fact, Plaintiff failed to respond at all to Defendants' arguments on this issue. It is undisputed that the Park District's policy prohibits race discrimination and retaliation. SOF ¶ 59. Accordingly, summary judgment as to Counts II and III with respect to Defendant Park District is granted.

### 4. Defendant Adams' Liability Under § 1981

Defendants argue that summary judgment should be granted as to Count II, with respect to Defendant Adams, because an individual may not be liable for discrimination under § 1981 unless the individual personally participated in the alleged discrimination against the Plaintiff.

---

not personally make the decision to fire Plaintiff, her prejudices could be imputed to McDonald if it can be shown that Adams concealed relevant information from McDonald or fed false information to her in order to influence her decision. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004) (citations omitted).

12

*Musikiwamba v. Essi, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985). Plaintiff likewise failed to respond to this argument. However, because there is a genuine issue of material fact as to whether Defendant Adams participated in the decision to terminate plaintiff, as discussed above, summary judgment on Count II with respect to Defendant Adams is denied.

### B. Retaliation

#### 1. Title VII (Count IV) and Section 1981 (Count V)

In Counts IV and V, Plaintiff claims that she was fired in retaliation for complaining about race discrimination during her employment, in violation of Title VII and Section 1981. To prevail in a Title VII retaliation action, Plaintiff must show that (1) she engaged in activity statutorily protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006).[4] Plaintiff admits that the first time she ever complained of racial discrimination in the worksite was August 9, 2006, when she wrote a letter to Park District General Superintendant Tim Mitchell claiming that she and the African-American children participating in Park District programming had been discriminated against. However, the causal connection between Plaintiff's report of discrimination and Plaintiff's termination is missing. Upon her own admission, Plaintiff was fired on August 1, eight days *before* she made the report of racial discrimination. SOF ¶ 44-46. Plaintiff offers no argument or evidence to the contrary; there is therefore no genuine issue of material fact regarding this sequence of events. Plaintiff's July 31, 2006, telephone call to DFCS reported child abuse, not racial discrimination, and therefore is not

---

[4] This states the standard for proving Title VII retaliation under the direct method of proof. Plaintiff makes no argument that the indirect method of proof is applicable to this case. Indeed, her failure to identify similarly-situated employees dooms the indirect method of proving both racial discrimination and retaliation under Title VII. *Burks*, 464 F.3d at 759 (indirect method of proving Title VII retaliation requires plaintiff to offer evidence of similarly-situated employees).

a statutorily protected activity under Title VII and § 1981.  Because Plaintiff cannot show that her termination was causally connected to her reporting of racial discrimination, summary judgment is granted to Defendants as to Counts IV and V.

### 2. First Amendment (Count IX)

Plaintiff's ninth cause of action alleges that Defendants violated her First Amendment rights by firing her for reporting to her employers that African-American children were subjected to racial discrimination.  However, just as with Counts IV and V above, this claim fails because Plaintiff cannot have been fired as a result of a report of racial discrimination she made eight days *after* her termination.  Furthermore, Plaintiff appears to have abandoned this claim, as she makes no argument in opposition to Defendants' motion for summary judgment.  When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e)(2).  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.  *Id.*  Accordingly, summary judgment is granted to Defendants as to Count IX.

### 3. Count X

Plaintiff's tenth cause of action, brought under the Illinois common law tort of retaliatory discharge, alleges that she was terminated in retaliation for reporting alleged child abuse as she was required to do under the Abused and Neglected Child Reporting Act ("ANCRA") of Illinois, 325 ILCS 5/4.  The ANCRA requires certain categories of professionals to report to DFCS if they have reasonable cause to believe a child known to them in their professional or official

14

capacity may be an abused child or a neglected child. *Id.* It is not disputed that Plaintiff, in her position, was required to report child abuse under the ANCRA.

Generally, an at-will employment like Plaintiff's is terminable at any time for any or no cause. However, Illinois recognizes an exception to this rule when such termination would contravene public policy. "All that is required is that the employer discharge the employee in retaliation for the employee's activities, and that the discharge be in contravention of a clearly mandated public policy." *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 134 (1981). Although Illinois law does not define what constitutes "clearly mandated public policy," the Illinois courts have recognized that the state Constitution and statutes express the state's public policy concerns. *Id.*, 85 Ill.2d at 130. Illinois courts have held that the ANCRA supports causes of action for retaliatory discharge. *Bea v. Bethany Home, Inc.*, 775 N.E.2d 261 (Ill. App. Ct. 2002) (upholding cause of action for retaliatory discharge where employee was fired for attempting to vindicate co-worker from false child abuse report in derogation of clearly mandated public policy expressed in ANCRA). Indeed, the ANCRA clearly prohibits retaliatory conduct by employers for their employees reports of child abuse:

> Employer discrimination. No employer shall discharge, demote or suspend, or threaten to discharge, demote or suspend, or in any manner discriminate against any employee who makes any good faith oral or written report of suspected child abuse or neglect, or who is or will be a witness or testify in any investigation or proceeding concerning a report of suspected child abuse or neglect.

325 ILCS 5/9.1. As such, an employer who fires an employee for reporting an incident of child abuse would be in contravention of a clearly mandated Illinois public policy concern.

Defendants claim that summary judgment is appropriate because McDonald was solely responsible for firing Plaintiff and she did not learn of Plaintiff's report to DFCS until after the decision to fire Plaintiff had been made. However, as described above, there remain genuine

15

issues of material fact with regard to who participated in the decision to terminate Plaintiff and when that decision was made. Therefore, summary judgment on Count X is denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Park District on Counts II and III, and with respect to all parties on Counts IV, V, and IX. The motion is **DENIED** on Counts I and X, and also on Count II with respect to Defendant Adams.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

**Dated:** November 7, 2008