# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CATHLEEN SCHANDELMEIER-BARTELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  07 CV 922 |
| v. | ) | |
| CHICAGO PARK DISTRICT | ) | JUDGE DAVID H. COAR |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Cathleen Schandelmeier-Bartels ("Plaintiff" or "Schandelmeier") sued the Chicago Park District ("Defendant" or "Park District"), her former employer, for "reverse race discrimination" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981, and 42 U.S.C. § 1983.  Plaintiff, who is Caucasian, complained that she was fired by her former employer, the Park District, because of her race.  After this Court granted summary judgment in part for Defendant, the parties proceeded to trial on the issue of whether Plaintiff was terminated because of her race in violation of Title VII.  Following a three-day trial in March of 2009, the jury returned a verdict in favor of Plaintiff and awarded her compensatory damages in the amount of $200,000.  Defendant now renews its motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.  In the alternative, Defendant moves for a new trial.  For the reasons set forth below, Defendant's motion for judgment as a matter of law is **GRANTED**.

1

## FACTUAL BACKGROUND

Plaintiff served as the Cultural Program Director for the South Shore Cultural Center for the Chicago Park District from February of 2006 until August 1, 2006. Plaintiff, who is Caucasian, was initially hired and ultimately terminated by Megan McDonald ("McDonald"), who is also Caucasian. While employed by the Park District, Plaintiff reported directly to Andrea Adams ("Adams"), who reported to Alonzo Williams ("Williams"). Williams, in turn, reported to McDonald. Both Adams and Williams are African-American.

Plaintiff's responsibilities at the South Shore Cultural Center involved running the Center's afterschool and summer camp programs. During the course of her employment by the Park District, Plaintiff struggled with several organizational aspects of her job, and she was accordingly reproached for her performance deficiencies. Plaintiff's organizational missteps included failing to complete her timesheets, failing to establish a consistent schedule of activities, and failing to complete incident reports accurately. In addition, when providing lunches to summer campers, Plaintiff failed to adhere to the guidelines established by the Department of Agriculture, which govern the distribution of summer lunches. As a result of her failure to follow these guidelines, Plaintiff was written up six times during the two months preceding her termination.

During June of 2006, Plaintiff's supervisor, Adams, issued three memoranda detailing Plaintiff's various performance issues and suggesting ways for Plaintiff to improve her performance. In early July of 2006, the month before Plaintiff was terminated, Beverly Napier ("Napier"), the manager the Park District's Food Service Program, alerted McDonald that the park for which Plaintiff was responsible had "a lot of trouble with the food service program." Plaintiff admits that, in the same month, Mary Ann Rowland ("Rowland"), the Director of

2

Human Resources, who is Caucasian, "strongly suggested" to Plaintiff that she transfer or seek another position within the Park District.

Finally, on July 24, 2006, McDonald drafted an e-mail to Rowland that set in motion the process for terminating Plaintiff's employment. McDonald's e-mail requested information from the Human Resources Department on the procedures necessary to release Plaintiff. At trial, McDonald testified that this e-mail reflected her decision to terminate Plaintiff and that she had reached this decision after consulting with three employees in addition to Adams: Williams, Rowland, and Napier. These employees based their assessments of Plaintiff's performance on several sources of information, including observations of Plaintiff and physical examples of Plaintiff's work, such as incomplete incident reports and write-ups regarding deficiencies in the food service program. Plaintiff neither alleged that Williams, Rowland, or Napier exhibited discriminatory animus toward her, nor challenged their opinions of her deficient performance. Rowland testified at trial that she in fact received McDonald's e-mail on July 24, 2006. Rowland confirmed that the proper procedures had been followed, and one week later, on the morning of August 1, 2006, Rowland prepared and signed a letter terminating Plaintiff's employment.

On July 31, 2006, the afternoon before she was notified of her termination, Plaintiff observed what she believed to be an incident of child abuse involving a summer camper ("J.J.") and his aunt, both African-American. J.J.'s aunt had been summoned to the camp to pick up J.J. after the camp had expelled him because of his behavioral problems. Plaintiff testified that she left J.J. and his aunt to retrieve J.J.'s incident reports from her office, and when she returned, she heard the "wacking" sound of an object striking flesh, followed by the cries of the child coming from the employee restroom. She then entered the restroom and saw J.J.'s aunt with a belt in her hand, poised to strike the child. As a Park District employee, Plaintiff was a mandatory reporter

3

of child abuse, and accordingly, she reported the incident to both the Department of Child and Family Services and the Chicago Police Department. However, Plaintiff neither notified Adams that she had contacted the authorities nor submitted an incident report describing what had happened.

Later in the day on July 31, 2006, Plaintiff reported the suspected incident of child abuse to Adams. According to Plaintiff, Adams replied by suggesting that what happened was a "cultural thing," implying that African-American parents, as a matter of cultural practice, discipline their children physically. Plaintiff testified that her conversation with Adams resumed the next morning. By this point, Adams had been informed by J.J.'s aunt that Plaintiff had contacted the authorities the previous evening and that the aunt had been visited by the authorities. After summoning Plaintiff to her office, Adams allegedly chastised her for reporting an incident of child abuse that may not have actually occurred, and ultimately, for her cultural insensitivity. Plaintiff alleges that Adams again stated that "this is the way we discipline children in our culture."

After meeting with Plaintiff, Adams drafted a memorandum to McDonalds and Williams ("the 'last straw' memo") that documented several instances of Plaintiff's deficient performance, in addition to the suspected child abuse incident that had just occurred. The memo referred to the suspected child abuse incident as the "last straw" and concluded by stating that "something has to give." Around 6:00 p.m. that day, Williams delivered the termination letter that Rowland had prepared to Plaintiff. Plaintiff was later replaced by a Caucasian woman.

Following her termination, Plaintiff sued the Park District for "reverse race discrimination" in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 1981, and 42 U.S.C. § 1983, claiming that she was fired by Defendant

4

because of her race. After this Court granted summary judgment for the Defendant in part, the parties proceeded to trial in March of 2009. On March 5, 2009, the jury returned a verdict in favor of Plaintiff, finding that she was terminated by Defendant because of her race and awarding her compensatory damages in the amount of $200,000. Defendant now renews its motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, claiming that Plaintiff did not provide sufficient evidence to allow the jury to find that she was fired because of her race. In the alternative, Defendant moves for a new trial.

## *DISCUSSION*

**1. Defendant's Motion for Judgment as a Matter of Law**

Defendant first argues that Plaintiff failed to present evidence sufficient to prove that she was terminated because of her race, and Defendant is therefore entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . ." Fed. R. Civ. P. 50(a)(1). When deciding a motion for judgment as a matter of law, the court considers "whether any rational jury could have found for" the nonmoving party. *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1085 (7th Cir 2007). Conducting this analysis, the court "must draw all inferences in favor of the nonmoving party," *Tart v. Ill. Power Co.*, 366 F.3d 461, 472, and "may not make credibility determinations or reweigh the evidence." *Id.* In addition, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* Because of the sensitive and difficult issues of fact in employment discrimination cases, the court is especially careful in these cases to avoid replacing its view of the credibility or weight of the evidence for that of the jury. *Id.*

At trial, Plaintiff faced the burden of proving that Defendant terminated her because of her race. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 similarly guarantees persons of different races equal rights in the making and performance of contracts, including employment contracts. Section 1983 extends the reach of the federal antidiscrimination prohibitions to persons acting under the color of the law. If Plaintiff offered sufficient evidence to allow a rational jury to conclude that she was terminated because of her race, the jury's verdict must stand.

There is no question but that a reasonable jury could have found that Adams made the statements attributable to her by Plaintiff. There is also no question but that if Adams made the statements, they were ignorant, bigoted, and demonstrated discriminatory animus under the facts of this case. Finally, there is no question that Adams lacked the authority to terminate Plaintiff. In order to attribute Adams's animus to McDonald, the decision maker, Plaintiff must have established that McDonald was "influenced" by Adams's racial animus. For her part, McDonald denies even knowing about the J.J. incident when she made the decision to terminate Plaintiff.

Viewing the evidence in the light most favorable to Plaintiff, and therefore assuming that Adams in fact made the racial comments to which Plaintiff testified, Plaintiff's case turns on whether a reasonable jury could find that those words, and the discriminatory animus they represent, controlled Defendant's decision to terminate Plaintiff. Plaintiff bases her argument that she was fired because of her race primarily on the suspicious timing of her termination; on July 31, 2006 and August 1, 2006, Adams allegedly directed racial comments toward Plaintiff, and hours after the last of those comments, Plaintiff's employment was terminated. To support her argument that the suspicious timing of her termination indicates that she was fired because of

her race, Plaintiff points to Adams's "last straw" memo, which referred to the suspected child abuse incident as the "last straw" and concluded by stating that "something has to give."

At trial, McDonald testified that she neither saw the "last straw" memo nor became aware of the incident that provoked the memo until after Plaintiff was terminated. McDonald offered uncontroverted testimony that she made the decision to terminate Plaintiff one week before Adams's alleged racial comments, on July 24, 2006. McDonald's decision was documented by the e-mail that she sent to Rowland, Director of Human Resources, on July 24, 2006, regarding the proper procedures she had to file when terminating Plaintiff.[1] Corroborating McDonald's testimony, Rowland testified that she received McDonald's e-mail on July 24, and after confirming that the Park District had followed proper termination procedures, she prepared Plaintiff's termination letter at 8:00 a.m. on August 1, 2006, before Adams drafted—and disseminated—her "last straw" memo.

This Court agrees with Defendant's argument that, given the timing of McDonald's decision to terminate Plaintiff, McDonald could not have been influenced by Adams's racial animus in making this decision. Indeed, summary judgment with respect to Plaintiff's claim was denied in part based on the hope that the evidence presented at trial would reveal whether McDonald decided to terminate Plaintiff before or after she read Adams's "last straw" memo or consulted with Adams regarding the suspected child abuse incident. However, at trial, Plaintiff introduced virtually no evidence that McDonald consulted Adams's "last straw" memo before deciding to terminate Plaintiff. Even if the jury disbelieved both McDonald's testimony that she terminated Plaintiff before she became aware of the suspected child abuse incident and

---

[1] Both parties stipulated to the authenticity of this e-mail; however, during closing argument, Plaintiff for the first time challenged the authenticity of the e-mail and suggested that it may have been fabricated after Plaintiff was terminated.

7

Rowland's testimony that she prepared Plaintiff's termination letter before Adams drafted the "last straw" memo, "[m]erely disbelieving the employer's explanation cannot sustain a jury verdict." *Filipovich v. K&R Exp. Sys., Inc.*, 391 F.3d 859, 864 (7th Cir. 2004).

Moreover, even assuming that McDonald reviewed the "last straw" memo before deciding to terminate Plaintiff, the evidence presented at trial *still* fails to support the jury's verdict that Plaintiff was terminated because of her race. Because Plaintiff never claimed that McDonald harbored racial animus toward her, she had the burden of proving that Adams's animus impacted McDonald's decision making. Where discriminatory animus originates with a non-decision making employee, such as Adams, that employee must exert a particularly high degree of influence over the decision maker for the court to impute her animus to the decision maker and therefore find actionable discrimination. *See Martino v. MCI Commc'ns*, No. 08-2405, 2009 U.S. App. LEXIS 16711, at *9-*12 (7th Cir. July 28, 2009); *Staub v. Proctor Hosp.*, 560 F.3d 647, 655-59 (7th Cir. 2009); *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 916-20 ( 7th Cir. 2007). The Seventh Circuit has deemed the theory governing such cases the "cat's paw" theory[2]—meaning that the decision maker simply "[took] the monkey's word for it," acting entirely based on his influence. *Staub*, 560 F.3d at 656. The court has held that:

> [W]here an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her 'singular influence' over an employee who does not have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII.

*Brewer*, 479 F.3d at 917. To find such "singular influence," the non-decision making employee "must possess so much influence as to basically be herself the true functional decision-maker."

---

[2] The description comes from the fable in which a monkey dupes a cat into scooping chestnuts from a fire, resulting in burned paws for the cat and free chestnuts for the monkey.

8

*Id.* (internal citations and quotation marks omitted). Accordingly, such influence is not found "where a decision maker is not wholly dependent on single source of information, but instead conducts its own investigation into facts relevant to the decision." *Id.* at 918; *see also Martino*, 2009 U.S. App. Lexis 16711, at *10 ("The [employer] can defeat . . . the cat's paw theory . . . by showing that . . . the decisionmaker did an independent analysis and came to his own conclusion."). The Seventh Circuit recently clarified the high bar a Plaintiff must clear to prevail using the cat's paw theory, stating that "the rule we developed in *Brewer* does not require the decision maker to be a paragon of independence;" the decision maker may rely on others' opinions so long as she refrains from "blind reliance" on one "singular influence." *Staub*, 560 F.3d at 659; *see also Martino*, 2009 U.S. App. Lexis 16711, at *11-*12 (recently reiterating and applying *Staub*'s clarification of the cat's paw theory).

The parties do not dispute that McDonald was the *actual* decision maker, with the power to hire and fire Plaintiff. Attempting to establish discrimination by using the "cat's paw" theory, Plaintiff argues that the jury reasonably concluded that Adams was the "singular" decision maker whose racial animus controlled McDonald's decision to fire Plaintiff. However, even if McDonald was aware of the suspected child abuse incident or was influenced by Adams's racial animus before she decided to fire Plaintiff, no reasonable jury could have believed that McDonald's decision to terminate Plaintiff stemmed from "blind reliance" on Adams. At trial, McDonald offered uncontroverted testimony that she consulted with three independent employees before deciding to terminate Plaintiff: Williams, Napier, and Rowland. Their opinions of Plaintiff's performance, which Plaintiff does not contest, align with the documentary evidence of Plaintiff's deficient performance. This evidence includes Adams' multiple memoranda to Plaintiff addressing her performance issues, write-ups by the Park District

monitor for Plaintiff's failure to adhere to the food service guidelines, and examples of Plaintiff's incomplete incident reports. Because McDonald reviewed all of this information before deciding to terminate Plaintiff's employment, it cannot be said that she "was wholly dependent on a single source of information" so as to render the cat's paw theory applicable. *Brewer*, 479 F.3d at 918. Because Plaintiff did not present sufficient evidence that Adams caused McDonald to serve as her "cat's paw" by exerting "singular influence" over her, therefore imputing Adams's discriminatory animus to McDonald, Plaintiff failed to establish that she was terminated because of her race in violation of Title VII.

**2. Defendant's Motion for a New Trial**

In the alternative, Defendant moves for a new trial, arguing that the jury instructions did not adequately convey the relevant legal principles, and as a result, confused and misled the jury. Although this issue is moot because we have granted Defendant's motion for judgment as a matter of law, this Court nonetheless finds that the jury instructions were adequate.

When reviewing jury instructions, courts must determine if the instructions adequately stated the law and did not confuse or mislead the jury. *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 705 (7th Cir. 2005). When conducting this analysis, courts first consider "whether the instructions in question misstate the law or fail to convey the relevant legal principles in full." *Id.* If they do, the court next considers "whether the inadequate statements confused or misled the jury causing prejudice to the [litigant]." *Id.* Inadequate jury instructions cause prejudice if, "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law." *Susan Wakeen Doll Co. v. Ashton-Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).

In this case, the jury began deliberating at 11:45 a.m. on March 5, 2006, and at approximately 4:00 p.m., the jury sent a note asking the Court to clarify an apparent inconsistency between Jury Instruction No. 17 and the verdict form. Instruction No. 17 included, in part:

> Ms. Schandelmeier-Bartels claims that on August 1, 2006, she was terminated from her position as Cultural Program Director for the South Shore Cultural Center because of her race.
>
> To succeed on this claim against the Chicago Park District, Ms. Schandelmeier-Bartels must prove by a preponderance of the evidence that she was terminated by the Park District because of her race.

In contrast to this instruction, the verdict form did not include the date, August 1, 2006, asking only, "Did Plaintiff Cathleen Schandelmeier-Bartels prove by a preponderance of the evidence that she was terminated by the Chicago Park District because of her race?" The jury's note to the Court pointed out that the date was listed in Instruction No. 17, but not on the verdict form, and asked, "Are we considering the date as a factor of the termination per jury instructions, or are we taking into consideration the entire span of Miss Schandelmeier's employment per written complaint?" Defendant requested that the Court respond to the jury's note by deleting the reference to August 1, 2006 from Instruction No. 17. Defendant argued that this proposal would correct the discrepancy between Jury Instruction No. 8's directive to "consider all of the evidence bearing on the question," and the jury's apparent perception that it may consider only events that occurred on August 1, 2006. The Court disagreed with Defendant's theory concerning the nature of the jury's confusion, rejected Defendant's proposal, and directed the jury to follow the instructions as initially given. The jury resumed deliberation, and approximately 90 minutes later, the jury returned a verdict in favor of Plaintiff.

Defendant contends that, while Instruction No. 17 accurately described the Plaintiff's burden of proof, its reference to August 1, 2006 misled the jury to focus only on the events of that day rather than considering "all of the evidence bearing on the question" pursuant to Instruction No. 8. According to Defendant, directing the jury to rely on the instructions as given would not cure their confusion, as the jury could have reconciled Instructions No. 8 and No. 17 in two ways: (1) by considering "all of the evidence" concerning Plaintiff's employment on August 1, 2006; or (2) by considering "all of the evidence" concerning Plaintiff's entire course of employment. Ultimately, Defendant argues that the Court failed to remedy the jury's apparent confusion, the jury likely ignored evidence of relevant incidents that occurred before August 1, 2006, and accordingly, the jury's unreliable result substantially prejudiced Defendant.

In response, Plaintiff argues that, as an initial matter, Defendant waived its objection to the jury instructions and verdict form by failing to make a timely objection pursuant to Federal Rule of Civil Procedure 51. Plaintiff contends that, even if Defendant had not waived its objection, the jury instructions adequately conveyed the relevant legal principles, and the jury's questions did not indicate that its verdict was based on a misunderstanding of the applicable law.

This Court agrees that Defendant waived its objection to the jury instructions. Federal Rule of Civil Procedure 51(b)(2) requires that the court offer "the parties an opportunity to object on the record . . . before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2). Subsection (c)(2) of rule 51 provides that "[a]n objection is timely if a party objects at the opportunity provided under Rule 51(b)(2)," namely before the delivery of closing arguments and instructions. Fed. R. Civ. P. 51(c)(2); *see also Griffin v. Foley*, 542 F.3d 209, 221 (7th Cir. 2008). Here, the parties prepared the instructions jointly and agreed on their adequacy before presenting them to the Court. Defendant claims that it did not waive its challenge to Instruction

No. 17 because it indeed objected to the Court's directive, after considering the jury's questions, that the jury follow the instructions initially provided. I reject Defendant's argument and find that Defendant has in fact waived its objection to Instruction No. 17. Defendant may have objected to the Court's directive in response to the jury's questions; however, pursuant to Rule 51, Defendant had to object to the instruction truly at issue (Instruction No. 17, not the Court's later directive), before the delivery of jury instructions and closing arguments. The fact that Defendant objected to the Court's mid-deliberations directive does not satisfy the requirements of Rule 51.

Rule 51 nevertheless provides the court discretion to address an error in jury instructions, even if it has not been properly preserved, if the court determines that "plain error" affected the substantial rights of the parties. Fed. R. Civ. P. 51(d)(2); *Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 751 (7th Cir. 2001). Such plain error exists if the court finds that "had it not been for an erroneous instruction [the party] would surely have prevailed at trial." *Mesman v. Crane Pro Servs.*, 512 F.3d 352, 357 (7th Cir. 2008); *see also Griffin*, 542 F.3d at 222. This Court finds that there is no "plain error" that would allow the Court to review the jury instructions and verdict form in this case. Juries routinely ask questions of the court while deliberating, and the fact that the jury submitted questions in this case does not automatically indicate that the instructions and verdict form contained errors that prejudicially misled or confused the jury. Moreover, there is no indication that Defendant would have prevailed had it not been for an erroneous instruction, and therefore we cannot find that confusion resulting from the jury instructions affected the substantial rights of the parties. Accordingly, I find that Defendant has waived its objection to the jury instructions and verdict

form, and the instructions do not contain the "plain error" required for this Court to review the instructions despite Defendant's waiver.

Even if Defendant had not waived its objection, and I had the opportunity to review the jury instructions and verdict form, I would not find that the jury instructions or verdict form misstated the law or caused prejudice to Defendant by confusing or misleading the jury. Although the jury's note to the Court reflected some confusion, it is likely that the confusion derived from the verdict form rather than the jury instructions. *See Ammons-Lewis*, 488 F.3d at 751. The parties agree that the jury instructions accurately and fully stated the legal principles necessary to guide the jury's decision making. They dispute, however, whether the discrepancy between Instruction No. 17 and the verdict form created confusion that prejudiced Defendant. Consistent with this Court's initial rejection of Defendant's suggestion to delete the date from Instruction No. 17, I do not believe that the jury's note indicates that it based its decision only on events that occurred on August 1, 2006. This Court finds no indication that the jury's verdict was a product of confusion or a misunderstanding of the law, and accordingly, I conclude that the jury instructions and verdict form were adequate.

## *CONCLUSION*

For the reasons stated above, Defendant's motion for judgment as a matter of law is **GRANTED.** In light of the forgoing, Defendant's motions for a new trial and remittitur are moot.

Enter:
/s/ David H. Coar
David H. Coar
United States District Judge

**Dated:** September 2, 2009